GARY M. RESTAINO
United States Attorney
District of Arizona
JOSEPH BOZDECH
California State Bar Number 303453
Assistant United States Attorney
Two Renaissance Square
40 North Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone: (602) 514-7500
Email: joseph.bozdech@usdoj.gov
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>$17,000.00 in United States Currency,<br><br>　　　　　　Defendant *In Rem*. | **VERIFIED COMPLAINT FOR FORFEITURE *IN REM*** |

Plaintiff United States of America brings this Complaint and alleges as follows in accordance with Rule G(2) of the Federal Rules of Civil Procedure, Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions (the "Supplemental Rules"):

**NATURE OF THE ACTION**

1.　This is a civil action *in rem*, brought to enforce the provision of 21 U.S.C. § 881(a)(6) for the forfeiture of United States currency which represents money or other things of value furnished or intended to be furnished in exchange for a controlled substance, proceeds traceable to such an exchange, and money used or intended to be used to facilitate a violation of Title II of the Controlled Substances Act, 21 U.S.C. §§ 801, *et seq.*

2.　This is a civil action *in rem*, brought to enforce the provision of 18 U.S.C. § 981(a)(1)(C) for the forfeiture of United States currency which constitutes or is derived

from proceeds traceable to a violation of a specified unlawful activity, including but not limited to dealing in a controlled substance and 18 U.S.C. § 1952, travel in interstate commerce with the intent to distribute proceeds of unlawful activity as defined in 18 U.S.C. §§ 1952, 1956(c)(7), and 1961. Venue and jurisdiction in Arizona are based upon 21 U.S.C. § 881(j) and 28 U.S.C. §§ 1355(b) and 1395 as acts and omissions occurred in the District of Arizona that give rise to this forfeiture action. This Court has jurisdiction. 28 U.S.C. §§ 1345 and 1355; 18 U.S.C. § 981(h).

## THE DEFENDANT *IN REM*

3. The defendant *in rem* is $17,000.00 in United States currency ("defendant property").

4. The defendant property was seized on March 13, 2023, near Eloy, Arizona, by the Drug Enforcement Administration ("DEA"). The defendant property is currently in the custody of United States Marshals Service.

## INTRODUCTION

5. On March 13, 2023, law enforcement conducted a traffic stop of a vehicle with a fraudulent license plate near Eloy, Arizona. A search of the vehicle revealed $17,000.00 in United States Currency. The currency was later alerted to by a trained narcotics canine.

## ALLEGATIONS OF FACT

### Fictitious Temporary Paper License Plate

6. According to DEA Agents and Task Force Officers (hereafter "Agents"), Drug Trafficking Organizations ("DTOs") buy fraudulent temporary paper dealer Texas license plates from unscrupulous car dealers, or make the plates themselves, and affix the plates to vehicles transporting drugs and drug proceeds. This makes it difficult, if not impossible, for law enforcement to identify criminals based upon their vehicles' license plates.

7. Unlike a permanent metal license plate that most drivers possess - which comes from the motor vehicle department and requires proof of identification, ownership,

and insurance - temporary paper dealer Texas license plates have fewer requirements and are simpler to counterfeit and produce. Also known as "tags," these fraudulent paper license plates are often created with stolen or fictitious information and allow DTOs to anonymously transport drugs and drug proceeds throughout the country.

8. On or about March 9, 2023, DEA in Tucson was informed that a DTO based in Caborca, Sonora, Mexico had utilized Texas temporary paper dealer license plate 1B3290E on multiple vehicles to transport large quantities of narcotics and illicit proceeds.

9. In one recent instance, a Ford Expedition with this fraudulent tag was stopped by U.S. Border Patrol near Alamagordo, New Mexico on March 9, 2023. A search of that vehicle revealed 33.4 kilograms of methamphetamine concealed in the gas tank.

**Traffic Stop Near Eloy Arizona**

10. On Monday, March 13, 2023, Arizona Department of Public Safety Troopers (hereafter "Troopers") stopped a GMC Yukon near Eloy, Arizona on westbound U.S. Interstate 10, milepost 207. The GMC Yukon had the fraudulent temporary paper Texas dealer license plate of 1B3290E. Troopers had also been alerted to look for vehicles with this plate. The temporary tag was issued by Munis Auto Sales in El Paso, Texas, and had been found on several vehicles throughout the United States that day.

11. The vehicle was driven by Cesar Bernardo Galarza ("Galarza"), with his wife Perla Gabriela Amaya ("Amaya") in the front passenger seat and four children in the back seat.

12. Galarza said he did not have a driver's license but provided a Texas Identification card and a temporary registration card to the Troopers. Galarza was told that the registration provided was not good for the GMC Yukon.

13. Troopers separated Galarza and Amaya and asked them each to explain their travel itinerary.

14. Galarza said they were traveling to the Universal Studios theme park in California from El Paso, Texas. However, he said they were delayed in their trip because he was stopped east of Tucson, Arizona by the sheriff's department for speeding. He said his vehicle was towed as a result.

15. Galarza said they ended up staying the night in a hotel nearby since he no longer had a vehicle. However, he soon contacted his friend Fernando who brought Galarza Fernando's GMC Yukon to drive. Galarza then continued his trip to California in the GMC Yukon.

16. Galarza said his group planned to stay in an AirBNB in California and return to El Paso on Saturday, March 18, 2023.

17. Galarza did not have any paperwork for his alleged traffic stop or the tow of his previous vehicle. He said the documentation was left in that car and he did not know where it was taken. He also did not know specifically what law enforcement agency had pulled him over.

18. Amaya, like Galarza, said the group was traveling from El Paso to Universal Studios. However, when asked if they stayed anywhere last night, Amaya said they did not. She said they had traveled straight from El Paso to their current location that day and had not stayed the night anywhere along the way.

19. Later, however, after Galarza and Amaya were reunited, the two explained their stories again to the Troopers and their accounts were now consistent. Troopers believe Galarza and Amaya collaborated and rehearsed their accounts to deceive law enforcement.

20. Amaya also said she did not have any documentation regarding the alleged first vehicle that was towed.

21. A records check of the GMC Yukon's VIN showed that its registration had expired. It was last registered to Caribe Motors in El Paso.

22. Galarza provided consent to search the vehicle.

4

23. Galarza said there would be no large amounts of currency or drugs in the car.

24. A search of the vehicle revealed a camera case located on the front passenger's floorboard. Concealed in the camera case were two bundles of U.S. currency wrapped in rubber bands. The first wrapped bundled contained $10,000.00 and the second contained $7,000.00.

25. This combined total of $17,000.00 is the defendant property.

26. Troopers, upon inspecting the gas tank of the vehicle, observed tool marks consistent with the recent tampering of the gas tank area. Based on the markings, the large amount of currency found, as well as the earlier drugs found in the gas tank of the Ford Expedition in New Mexico with the exact same tag, Troopers believed drugs and/or drug currency were being transported in the GMC Yukon too.

27. Following the discovery of the defendant property, Agents arrived to assist the Troopers.

28. In response to Agents' questions, Galarza said the GMC Yukon was a rental from an independent person, but later recanted and said it was a loaner from a mechanic's shop because Galarza's own vehicle was being repaired.

29. Galarza also said it was his second loaner vehicle because, as he had stated earlier, his first one had been seized by law enforcement south of Tucson for excessive speeding.

**Alert to the Defendant Property by a Trained Narcotics Canine**

30. On March 13, 2023, DEA Task Force Officer Gabriel Tapia ("TFO Tapia") arrived at the scene of the stop with his narcotics detection canine "Iris."

31. Iris is a Labrador trained to alert to the odors of methamphetamine, heroin, cocaine, and their derivatives. Iris was certified by the National Police Canine Association ("NPCA") on June 22, 2022 and re-certified by the NPCA on February 10, 2023. Iris has been working narcotics detection for the Marana Police Department since June 22, 2022.

32. Iris and TFO Tapia currently hold a national certification in narcotics detection given by the NPCA. TFO Tapia is the only handler for Iris.

33. Iris alerts to the odor of narcotics on currency when the currency has been in recent proximity to narcotic substances.

34. If Iris, at any time during a search, smells any of the three odors or derivatives she is trained to detect she will give a passive alert at an area by sitting next to it.

35. Iris is a sophisticated drug dog. *See United States v. $132,245.00 in U.S. Currency,* 764 F.3d 1055, 1059 (9th Cir. 2014).

36. TFO Tapia took custody of the defendant property and transported it to a controlled setting at the DEA's Tucson District Office.

37. After transferring the defendant property to another Agent, TFO Tapia directed Iris to sniff the floor, carpet, walls, and doors of a hallway in the DEA Tucson District Office. Iris did not alert anywhere in the hallway. TFO Tapia then walked outside and placed Iris in their vehicle, stayed with Iris, and requested that Agents place the manila envelope containing the defendant property, along with two other envelopes, in the hallway previously sniffed by Iris. Agents placed the three manila envelopes in the hallway as requested by TFO Tapia.

38. TFO Tapia and Iris returned to the hallway, with TFO Tapia directing Iris to conduct a sniff of the hallway and the three envelopes. Iris sniffed the three envelopes and displayed a change of behavior on the envelope containing the defendant property, indicating that she smelled one or more of the odors she was trained to detect. Iris gave a positive alert to the envelope containing the defendant property by sitting next to it.

**Further Statements by Galarza and Amaya**

39. Galarza told Agents that the money seized was $15,000 and that it came from the sale of his wife's 2015 Dodge Durango. Amaya agreed that the money came from the sale of her Durango but disclaimed ownership of the currency, stating, "No, it's his (Galarza's) because he sold my car."

40. Galarza said he was employed as a painter and ran a side business in which he bought cars at auctions and then sold them in Zacatecus, Mexico.

41. When Agents asked if he had a dealer's license to sell vehicles, Galarza said he did not have one in his name but claimed to rent dealer licenses from two individuals.

42. Even though Galarza and Amaya both said they were going to stay in an AirBNB while in California, neither had any details or information regarding the location of the AirBNB. They each said that someone else had reserved the stay.

43. Based on their training and experience, Agents know it is common for those traveling with drug proceeds or drugs to provide explanations for their travel but not provide evidence or proof to verify their claims.

## Seizure of the Defendant Property

44. On March 13, 2023, based upon the fraudulent temporary paper Texas dealer tag found on Galarza and Amaya's GMC Yukon, the suspicious markings found on the GMC Yukon's gas tank, the identical tag found on a Ford Explorer with drugs in New Mexico, the same tag found on numerous other cars throughout the United States, Galarza and Amaya's inconsistent and evasive statements, and the alert to the currency by a trained narcotics canine, the DEA seized the defendant property.

## Administrative Claim by Amaya

45. On June 9, 2023, the DEA received and Administrative Claim from Amaya.

46. In her claim Amaya stated the following:

> Was on my way to California for vacation when a traffic stop was conducted – license plate violation I was told. I had $17,000 and it was taken from me. I would like it returned to me. I've attached affidavit

47. The affidavit was signed and notarized and stated:

> To Whom It May Concern:
>
> This letter is to certify that I, Perla G. Amaya, residing at 2605 Radford St. El Paso, Texas, 79903, had previously sold my 2015 Dodge Durango, VIN#1C4RDHG9FC829805, in the amount of $15,000 U.S. dollars to Alberto Ivan Alferez Castillo. Attached is a copy of my liability insurance card and registration of said vehicle

7

> that I had previously to selling my vehicle to Mr. Alferez. This was the money I took with me for vacation.
>
> We were on our way to California for vacation, Cesar, my husband, age 25, Isabel, my sister-in-law, age 15, Angel, my brother age 13, Kayla, my daughter, age 9, Jesus, my son, age 7. When we were stopped for having a paper plate on the vehicle. The money that was taken from me was from the sale of my Durango and we were using that money to take our vacation to California.
>
> I respectfully request that my $17,000 be returned back to me.
>
> Sincerely,
>
> Perla Gabriela Amaya

48. Amaya also provided a prior insurance card for the 2015 Durango.

49. However, the document she provided and said was the vehicle's registration was a poor copy and illegible.

50. Both Amaya and Galarza on March 13, 2023 said the money found in the GMC Yukon was $15,000. It was not until the defendant property was seized and counted by the DEA, and Amaya was noticed of the administrative forfeiture, that Amaya claimed the currency amounted to $17,000 instead.

51. According to Agents, it is common for those trafficking in drug proceeds not to know the exact amount of the currency being transported.

## Additional Investigation

52. Further investigation by DEA revealed that between March 2020 and January 2022, Galarza made approximately 206 financial transactions totaling about $302,247, utilizing one financial institution.

53. Galarza's transactions were made frequently at numerous locations via this institution. The transactions were all sourced with cash and primarily conducted in two ways: (1) Galarza would direct a financial institution to pay a bill to a business with his cash or (2) he would buy money orders with cash written out to the payment of a business.

54. Of those 206 financial transactions, 180 were payments on Galarza's behalf via the financial institution to a business known as Copart. His total payments to Copart in this method were approximately $246,684. All sourced with cash.

8

55. Copart is an online auto auction that offers more than 200,000 cars, trucks, SUVs, motorcycles, and other vehicles for sale. The majority of the vehicles offered have salvaged titles issued to them by a state's department of motor vehicles.

56. A salvaged title means an insurance company has determined a vehicle to be a total loss, usually because of a major auto accident. States have different laws regarding such vehicles, but some allow salvage titled vehicles to become street legal again if they are repaired and pass an inspection.

57. Copart has been in business since 1982 and has had an online auction since 1996.

58. Galarza's payments to Copart were frequent, via one financial institution at multiple locations, and often under $10,000.

59. The money orders purchased were also frequent, via one financial institution at multiple locations, and often under $10,000.

60. Based upon their training and experience, Agents believed Galarza was money laundering drug proceeds for the DTOs through a method known as "structuring."

61. Structuring involves making multiple small cash bank transactions, instead of a few large cash transactions, to avoid the regulatory scrutiny of banks and law enforcement. Banks are required by law to ask persons specific information about the source of cash transactions made over $10,000, and to report it to law enforcement if the information or circumstances appears suspicious.

62. DEA investigation showed that Galarza followed a similar structuring pattern through a second financial institution as well.

63. Between April 2020 and May 2021, Galarza made 19 cash deposits totaling about $38,934 into this second financial institution. During this time he also purchased 11 cashier's checks with cash totaling approximately $36,000. The cashier's checks were paid out to Copart, as well as another large online auto auction known as Insurance Auto Auction ("IAA"). Like Copart, IAA specializes in selling total-loss, damaged, and low-value vehicles.

64. In all, Galarza made at least 30 cash transactions totaling approximately $74,934 via this second financial institution.

65. Though on a lesser scale, Amaya too appears to have been structuring and money laundering.

66. In June 2019 she made a cash deposit of $11,305 and in May 2020 she made another of $19,923.

67. Altogether, it appears between Galarza and Amaya, they completed cash transactions totaling approximately $408,409 between June 2019 and January 2022.

68. Texas wage records show that Galarza's last reported income was in the second and third quarters of 2019, when he made $13,236 and $7,332 with Mulholland Energy Services LLC, respectively.

69. Galarza provided no information regarding his alleged "side business" involving the sales of cars, and Agents could find no record of it either.

70. Amaya has had no reported income in the state of Texas.

71. On August 16, 2023, Agents requested additional information and documentation from Amaya regarding her alleged sales of the Dodge Durango to Alberto Ivan Alferez Castillo through a phone call. As of today's date, Amaya has not provided any such information or documentation.

72. However, a records check by the DEA revealed that Amaya is likely still the owner of the 2015 Dodge Durango.

73. According to a vehicle registration query, Amaya registered a 2015 Dodge Durango, VIN 1C4RDHDG9FC829805, Texas license plate PTL5236, in her name on or about September 30, 2021. The previous owner was Progressive Casualty Ins, of Vilonia, Arkansas. That earlier registration by Amaya had an expiration date of August 31, 2022.

74. The records check also showed that Amaya registered the 2015 Dodge Durango in her name again on August 24, 2023.

75. Based on these records, despite Amaya's statement that she sold the 2015 Dodge Durango prior to her traffic stop on March 13, 2023, repeated in her administrative claim on June 9, 2023, she registered the vehicle it in her name just a few months later.

76. Based upon the registration information, and Amaya's lack of information regarding her alleged sale of her vehicle, Agents believe Amaya is and has been the owner of the 2015 Dodge Durango since 2021 and did not sell it for $15,000.

## **SUMMARY**

77. The defendant property was the proceeds of drug trafficking and/or facilitated drug trafficking and is subject to forfeiture for the following reasons:

   a. Galarza and Amaya's vehicle had a fraudulent Texas tag;

   b. The same fraudulent tag was found on a vehicle in New Mexico that contained 33.4 kilograms of methamphetamine concealed in a gas tank;

   c. Tool markings on Galarza and Amaya's vehicle's gas tank;

   d. Galarza's false statement that no large amounts of currency would be found in the vehicle;

   e. The defendant property found in the vehicle;

   f. Galarza and Amaya's inconsistent statements regarding their travel plans, the acquisition of the second loaner vehicle, as well as the source of the defendant currency;

   g. The alert to the defendant property by a trained narcotics canine;

   h. Both Galarza and Amaya's lack of legitimate income;

   i. Amaya's statement that the defendant property belonged to Galarza and not her, even though she later made an administrative claim to it;

   j. Galarza and Amaya's structuring of cash transactions totaling over $400,000 in two-and-a-half years;

   k. The lack of requested information provided by Amaya regarding her alleged sale of a 2015 Dodge Durango as the source of the defendant property; and

l. Records for the 2015 Dodge Durango showing Amaya registered it in her name in September 2021 and again in August 2023.

### FIRST CLAIM FOR RELIEF

78. Based on the aforementioned facts and circumstances, the defendant property was furnished or intended to be furnished by a person in exchange for a controlled substance or listed chemical in violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801, *et seq.*, or constitutes proceeds traceable to such an exchange, or was used or intended to be used to facilitate a violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*, and therefore is subject to forfeiture to the United States pursuant to 21 U.S.C. § 981(a)(1)(A).

79. The defendant property constitutes or is derived from proceeds traceable to some form of specified unlawful activity, conducted and attempted to conduct a financial transaction, i.e., the movement of the proceeds of trafficking in controlled substances in violation of 18 U.S.C. § 1952, and therefore is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

### PRAYER FOR RELIEF

WHEREFORE, the United States of America prays that process issue for an arrest warrant *in rem* issue for the arrest of the defendant property; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the defendant property be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other and further relief as this Court deems just and proper, together with the costs and disbursements of this action.

Respectfully submitted this 6th day of September, 2023.

GARY M. RESTAINO
United States Attorney
District of Arizona

*S/Joseph Bozdech*
JOSEPH BOZDECH
Assistant United States Attorney